**STATE of Missouri, Respondent,**

v.

**Everett ROARK, Appellant.**

**No. 53365.**

Supreme Court of Missouri,
Division No. 2.

June 10, 1968.

Norman H. Anderson, Atty. Gen., Deann Duff, Asst. Atty. Gen., Jefferson City, for respondent.

Ted M. Henson, Jr., Poplar Bluff, for appellant.

PRITCHARD, Commissioner.

In this proceeding under Supreme Court Rule 27.26, V.A.M.R., appellant sought to have his conviction of the crime of murder in the second degree, and his 15-year sentence thereunder, all made upon his plea of guilty to the charge, set aside and a new trial ordered. The grounds for his motion are: (1) That he was sick at the time he entered his plea of guilty on June 28, 1966, and did not therefore understand what he was doing because of his then mental condition; and (2) that he had a meritorious defense of self-defense to the murder charge. Upon the evidentiary hearing had upon his motion under said Rule 27.26, appellant contends the preponderance of the evidence establishes the grounds of his motion and therefore the court erred in finding against him.

On the hearing on the motion appellant testified that he is 53 years old and is presently an inmate in the State Penitentiary in Jefferson City, Missouri. He had been a resident of Butler County all his life. On

June 28, 1966, he was charged in the Butler County Circuit Court with murdering his brother, James Roark, and on that date he entered a plea of guilty. He testified he was then sick and did not realize what he was doing; he had the flu, was sick and was just nervous. He had a fever, his head hurt, he was dizzy and he would have blackout spells, he had not been sleeping well for several months or the last several nights prior to June 28, 1966. He would take nervous spells and it was not long until he would black out.

Appellant just barely remembered being in court on June 28, 1966. He had no education, having gotten into the first grade but not completing it. He cannot write, except to scribble his name. He cannot read to do any good. He did not realize or understand what the judge was saying to him on June 28, 1966. He had talked to his lawyer before he went before the judge, but did not understand what his lawyer was talking about. "I still was nervous and tore up." He had never been in court or before a judge before that time. He had never heard legal matters discussed, or legal terms used. The charge was read to him as far as he knew, but he could not understand it. Since June 28, 1966, he has gradually gotten over his sickness, it taking several months. At the time of the present hearing he understood what was going on; that the charge was that of second degree murder on May 20, 1966, of James Roark. With respect to that occurrence appellant testified that he was living with James, taking care of him and "keeping the water and wood in." Appellant came downstairs and James gave him a drink of whiskey. The dog was barking and appellant walked out on the porch to see what she was barking at. James came out there and said, "I am going to blow your Goddamn brains out, and he ran in the house and grabbed a .38 pistol." James had the loaded pistol in his right hand, and pointed it at appellant who hit him and knocked him off the porch. James was four steps from appellant when he pointed the pistol. Prior to May 20, 1966, James had never threatened to kill appellant or do him any bodily harm. They always got along good.

James had been drinking a little; appellant was not intoxicated, and had not struck James or threatened him prior to the time he pointed the gun at appellant.

*On cross-examination, appellant testified* that he was sick and had the flu on the date his brother was killed and also on June 28 when he pleaded guilty. He had been to see a Dr. Robertson at Lucy Lee Hospital, and was given some medicine. Appellant told the sheriff in his investigation that James said he was going to get a pistol and shoot him. He did not tell anyone, including his lawyers, before this hearing, because of his sickness and illness. "Q. Do you remember in your statement to the Sheriff, about how this happened, do you remember after you knocked your brother off of the porch, saying that you jumped off of the porch on his head with your feet? A. I don't hardly remember about that. I remember saying something about it. When he throwed that gun in my face it frightened me and scared me so, I had just a regular nervous attack. Q. Well, when he fell, did he drop his gun? A. Dropped his gun, the best I can remember. Q. Dropped it on the floor? A. Yes, sir. Q. Whenever he fell off of the porch? A. He didn't have a gun on the ground. Q. He didn't have a gun there laying on the ground? A. Well, I don't remember about that. Q. But still you jumped on his head with your feet at that time? A. I don't remember what I did. When I come to myself, I was in that lane, going up to this house, when I came to myself." It was around three or four months after appellant went to the penitentiary that he got over the nervousness, the flu and the sickness. He did not tell his lawyers at any time that he was sick, had blackout spells, and didn't understand what was going on.

In answer to questions by the court, appellant testified he did not recall being

before a coroner's jury on May 23, 1966, and being there questioned by the prosecuting attorney and the coroner. He did not remember testifying and giving the coroner's jury a statement as to actually what happened. Appellant was sick and "tore up." He had the nervous spell and blackout when he and his brother had the fight, and another spell when he was in jail a day or two before he went to Magistrate Court. The blackout spell lasted about a day and a night. He did not report to the sheriff or anyone else that he had a blackout spell. He was not unconscious when he came to court, and a lawyer being appointed, but he did not realize what he was doing. He was unconscious at the time the plea of guilty was entered. He was not "plum (unconscious) where you fall out, but I was so sick I couldn't hardly hold my head up." He got up and stood in front of the bench; he didn't think the judge was Judge Henson; he had one lawyer present, John Casey; the judge read the charge, "But I was so sick, I don't remember what it was, sir, but I blacked out." He knew it was daylight, in the afternoon; Deputy Sheriff Leo Hodge was in the courtroom, having brought appellant from the jail. Appellant remembered being taken back to the jail by Hodge, and "kinda" realized along that evening what had happened to him—"I was kinda half way getting at myself." Two or three months later in Jefferson City he learned for the first time from talking to an inmate, Mr. Brookshire, that his sentence was 15 years.

For the state, the entire record of the proceedings against appellant was admitted into evidence. Upon the original charge appellant was arrested on May 20, 1966. On June 1, 1966, the transcript after preliminary hearing was filed in Circuit Court. On June 14, 1966, appellant was present in the latter court and stated that he was not represented by counsel. The record recites that the nature of the charge was explained to appellant, his right to counsel and of the court's willingness to appoint counsel for him. Appellant stated he was unable to employ counsel and asked the court to appoint same. George R. Wilhoit and John Casey were appointed as counsel to represent appellant. The information was amended by the state, by leave of court, on June 28, 1966, to charge murder in the second degree. On that date the prosecuting attorney was present as was appellant with his counsel, George Wilhoit. On interrogation by the court, appellant gave his name and acknowledged that he was present with his attorney, Mr. George R. Wilhoit, Jr. Appellant stated first that he had talked with both his counsel one time, then corrected that to talking with Mr. Casey twice. The court asked appellant if he wanted to talk with counsel some more; that there was no hurry about it and that he wanted to give appellant every chance to do what he wanted; that he was not trying to rush appellant; and asked further if appellant wanted to talk to them some more or did he want to dispose of his case that day. Appellant stated he wanted to dispose of the case that day; that he had a chance to advise with counsel and they explained the case and its possibilities to him. He stated he understood the nature of the charge that was against him.

Appellant further stated to the court on June 28 that the sheriff and the deputies had treated him mighty nice; that he was fed all right; and that nobody had offered him any reward or promised him anything if he were to plead guilty. No one attempted to tell him what his sentence would be if he did plead guilty. No one threatened him if he didn't plead guilty. "Q. And has anybody told you that if you stood trial that you would get a bigger sentence or lesser sentence? A. No, sir, I am guilty. Q. Nobody has threatened you or promised you anything? A. No, sir." The charge was read and appellant was asked, "What is

your plea, guilty or not guilty? A. Guilty."

Thereupon the facts were stated by Mr. Scott, the prosecuting attorney. Without objection the transcript of the coroner's inquest, which contains the confession, was introduced as Exhibit A.

Appellant was at the coroner's inquest first advised that he was not required to give evidence in the case; that anything he said could be used against him in a court of law; that he was entitled to have an attorney present and to consult with him and advise as to what his rights were. Appellant then testified that, upon being so advised by the prosecuting attorney, he could give a statement as to what happened.

Appellant's testimony concerning the occurrence, given at the coroner's inquest, is as follows: On Friday morning, approximately 6:00 or 7:00 o'clock, appellant got up, came downstairs and built a fire in the cookstove. James gave him a little drink of whiskey. The fire began to get hot, and appellant and James walked out on the porch. James handed the bottle over and told appellant to take a good one. Appellant said, "no thanks buddy." James said, "[Y]ou are another smart son-of-a-bitch like the rest of the world and I said Bud lets don't call our mother that. He said I am going to blow your God damn brains out and when he started through the front door to get his pistol inside the house I doubled my fist up and hit him about like that in the neck and knocked him off the porch and when he fell off of the porch he said I am getting up and I am going to kill you. And I jumped on him with my boots and stomped him, the best I remember twice. After I done it I hated it so bad and it was just like a dream. I just barely could remember when I got to Mr. Clayton's place and told him what to do." Appellant testified further that he might have stomped James more than twice. When he got to Mr. Clayton's house he

was welding on a big trailer job. Appellant told him to call the coroner's jury and the sheriff. James was 75 years old, appellant was 52. James' physical condition "wasn't too good and he had been drinking awfully bad." James "wasn't too big," he weighed around 155 or 160 pounds. At the conclusion of the testimony, appellant told the coroner's jury: "That is all, that is the straight truth what I told you. There is no use sitting here and trying to tell you a lie. That is the straight truth. God will know that on Judgment Day. He will know that on Judgment Day. That is all I can tell you." The pathologist's report of autopsy was read, showing that James' body had "three severe injuries to the face, involving both eyes and the nose, there are extensive lacerations or tears of the skin below both eyebrows and a deep laceration of the root of the nose, and the cheek bones on both sides are crushed, the upper jaws are crushed. There have been two severe injuries by a broad blunt object. There is a third injury to the lower lip which is split and contused. There are five broken ribs on the right side of the chest. * * *."

After his plea of guilty, appellant further told the court substantially the same facts as he had testified to at the coroner's inquest. Mr. Wilhoit, counsel for appellant, told the court that appellant had told him previously (in conferences) what he had told the court, and that he did desire to plead guilty to the charge which had been made against him.

■ It is apparent from the foregoing evidence of events prior to the entry of the plea of guilty and what appellant (being the only person now to testify) says in this hearing that there was a question of fact for the trial court to resolve as to whether appellant was ill or mentally disturbed to the extent that he did not know the nature of the proceedings against him. It is true, as appellant argues, that Supreme Court Rule 25.04,

V.A.M.R., requires that the trial court shall not accept a plea of guilty without first determining that the plea is made voluntarily with understanding of the nature of the charge. But from all of the record of what transpired on June 28, 1966, it is not true, as appellant contends, that the trial court did not determine that the plea was voluntarily made (appellant had conferred with counsel, who told the court that appellant *desired* to plead guilty). Great pains were taken by the court to insure that appellant understood the charge—he was specifically asked that question by the court and answered, "Yes, sir." The record of the coroner's jury proceedings was before the court, and shows that appellant understood what had happened, and there would be a criminal charge growing out of the occurrence. Although appellant is a person of slight formal education, the transcript shows that at all times he was articulate and responsive to the questions put to him, and in explaining to the court his present grounds in asking for a trial on the merits. The trial court here did ascertain that appellant had conferred with counsel about the charge and the various possibilities; further opportunity to confer with counsel was tendered; the court did hear completely the state's version of the facts; and appellant told his own counsel, after conferences, that he did desire to plead guilty. There was no lack of inquiry into these matters relative to the appellant's understanding of the charge and the voluntariness of his plea as was present in State v. Mountjoy, Mo., 420 S.W.2d 316. Rather, the facts concerning the protection of appellant's rights are within the guidelines of State v. Williams, Mo., 361 S.W.2d 772, and the detailed court inquiry of the accused in the later case of State v. Williams, Mo., 391 S.W.2d 227. In this case it was for the trial court to determine appellant's present denial of understanding the charge and voluntariness of his plea in view of the conflicting, contradictory version of the events as shown by the previous court records. State v. Hodges, Mo., 383 S.W.2d 551; State v. Richardson, Mo., 347 S.W.2d 165. The facts here do not fall within appellant's cited cases of State v. Blaylock, Mo., 394 S.W.2d 364, and State v. Bursby, Mo., 395 S.W.2d 155, where there was inadequate inquiry of defendants and counsel concerning the charge and its consequences. See also State v. Harris, Mo., 420 S.W.2d 325. No manifest injustice to appellant could have resulted where, under the record, the plea was in fact voluntary and was made with an understanding of the nature of the charge. State v. Sayre, Mo., 420 S.W.2d 303.

 Appellant's second point is that he had a meritorious defense to the charge of second degree murder, that of self-defense. The two versions of the incident are above related. The first, at the coroner's jury hearing and at the trial court, tends to show that appellant struck and stomped James before he procured the pistol; the latter tending to show that James had the pistol pointed at appellant when the blows were struck. Under the state of the record, it was for the trial court to believe which of appellant's versions of the occurrence was correct, and, understanding the charge, whether he pleaded guilty knowing that his first version and the facts showing an aggravated assault when James was not armed would be a factor in effectively submitting such a defense of self-defense to the jury. The reasonable cause and necessity for the killing must be viewed in the light of circumstances as they appeared to appellant (State v. Parker, Mo., 403 S.W.2d 623, 627 [3]). Those facts and circumstances were for the trial court to determine under the contradictory evidence as to which version would be applicable to a plea of self-defense. State v. Richardson, supra. It was reasonable to conclude that appellant's first version of the facts was the correct one, and it would follow that in entering his guilty plea he, himself,

thought that self-defense would be no real defense to the charge.

It does not appear that the findings, conclusions and judgment of the trial court are clearly erroneous under Supreme Court Rule 27.26(j), V.A.M.R. Accordingly, the judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.