**STATE of Missouri, Respondent,**

v.

**Joseph John MALONEY, Appellant.**

**No. 53599.**

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1968.

Motion for Rehearing or to Transfer to Court
En Banc Denied Dec. 9, 1968.

Norman H. Anderson, Atty. Gen., Richard C. Ashby, Asst. Atty. Gen., Jefferson City, for respondent.

Eugene V. Krell, St. Louis, for appellant by appointment for purpose of appeal only, Silver, Suffian & Rosenthal, by Milton Suffian and Joseph S. Rosenthal, St. Louis, by appointment on hearing of motion of appellant only, of counsel.

HIGGINS, Commissioner.

Appeal from denial of Motion to Set Aside Judgment and Sentence pursuant to Criminal Rule 27.26, V.A.M.R.

On February 2, 1960, appellant pleaded guilty to the crimes of murder, first degree, and three charges of robbery, first degree. He was sentenced by Judge Nangle to life imprisonment on each charge, the sentences on the robbery charges to run concurrently with the sentence for murder. He is confined in the Missouri State Penitentiary.

Appellant filed his motion September 7, 1967, and was accorded an evidentiary hearing November 3, 1967, at which he testified in his own behalf. He stated he was arrested about 11:30 p.m., December 16, 1959, and taken to Third District Police Station "until about 1 o'clock Friday afternoon * * * December 18 or 19—18th, I believe." He signed a confession that Friday afternoon. While at Third District he was kept "in a jail cell. I would say I was being interrogated more than I was in my cell, but an alternation between the cell and the interrogation room. * * * it lasted all night the first day, and the next day it lasted—it would alternate for periods of about two hours at a time with about an hour lapse in between. * * * There was a girl involved, and we made a deal that if I would sign the confession to all the charges against me they would leave this girl out of the matter entirely, exclude her name from the investigation or any reports they submitted to the Circuit Attorney's office, and on that basis I signed all of the confessions. * * * She was on a convalescent leave from the State Hospital Number 1 in Fulton, Missouri." As to threats or other deals, "That was the primary one. Naturally, it was understood probably it would go easier on me if I confessed and things like that, but primarily the only interest was this girl's welfare." He first appeared in court "as near as I can remember, around December 21, on Monday morning. * * * the only thing they did was to tell me the seriousness of the charges." He next appeared in court "January 15, I believe it was," for arraignment, at which time he pleaded not guilty. He was in jail between December 21, 1959, and January 15, 1960. He did not make bail and did not know if he was able to make bail[1] during the period of his detention. "I wrote one note to Mr. Clarence Godfrey * * * with the Public Defender's Office, and I told him that to the best of my knowledge my people

1. Art. I, § 20, Mo.Const., 1945, V.A.M.S., provides for bail "except for capital offenses, when the proof is evident or the presumption great." Murder, first degree, and robbery, first degree, are capital offenses. Sections 559.030 and 560.135, V.A.M.S.

probably would retain a lawyer at a later time when they were able to, but at that time I wanted him to see about filing a motion for a psychiatric examination, because I had been in the State Hospital about six months before that, and he filed that motion and that was the extent of our association."

He had a trial set for February 1, 1960, and, on February 2, 1960, pleaded guilty to the four charges against him and received the four concurrent life sentences. Prior to pleading guilty, "I was taken into a room here in the courts building and my mother was there, and Mr. Metz (Milton Metz, Public Defender for the City of St. Louis) was there, and Mr. Draper (George Draper, Assistant Circuit Attorney) was there * * * I was advised it would be best for me to plead guilty at that time, and I stipulated I wanted to go to a jury trial with the case, and Mr. Metz told me, after signing the confession to the Court I could not be acquitted, and I still insisted I wanted to have a jury trial in the matter and Mr. Metz told me that, and if I couldn't plead guilty for my sake, after the signed confession it would ruin him as a lawyer and so forth. * * * That was the gist of the conversation and my mother started imploring me to plead guilty because she said if I didn't and I received a death sentence it would kill my grandmother, and she would commit suicide, and I still insisted I wanted a jury trial. So, Mr. Metz told my mother that I wouldn't be sentenced that day, and my mother left. * * * One other thing, I was told during the course of this conversation, I was told that that day would be my last chance to plead guilty, because if I didn't plead guilty that day I would be transferred out of Judge Nangle's court into some other judge's court where they really get tough, and that is actually— I was back in the confinement cell, and I called Mr. Metz up and I told him I would go in and plead guilty that day, and we came in court and pleaded guilty."

He stated he was not offered the services of an attorney prior to making his confession and that he had not been advised of any rights concerning the confession. He did not have a preliminary hearing and, through Mr. Metz, "I was led to believe the confession was the pivotal point of the entire case, and with it in the State's possession I couldn't be acquitted. So therefore, I had to assume the confession in and of itself was a conviction." In respect to line-up, "I was identified in three charges of Armed Robbery at the District Station. * * * I knew that these people had been brought down to identify me for the simple reason I was taken into the booth and they were outside, and we were taken into the identification—interrogation room and I was asked to confess in their presence. I was fairly certain these people were asked to identify me in connection with the crime."

He never told the court he wanted a jury trial. "I believe Judge Nangle asked me did I know I was entitled to a trial by jury and if convicted it could be a lesser or greater sentence or something like that, and those are approximately the exact words, but, as I stated before, this matter was already settled before I came in the court room, and I took this all as a matter of policy."

Appellant acknowledged that Mr. Metz was present with him in open court when the pleas of guilty were entered and sentences pronounced. He also acknowledged presence of Mr. Metz at his arraignment and stated that no physical force was used against him during his detention. At the hearing and pursuant to memoranda, the court showed appointment of Mr. Metz as attorney for defendant *nunc pro tunc*.

Upon cross-examination appellant described his conference with Mr. Metz, Mr. Draper, and his mother, prior to his plea, as lasting approximately twenty to twenty-five minutes; that he was alone after the conference back in the confinement room, and that after some five minutes he called Mr. Metz and "asked him * * * if that deal was still open for me to plead guilty for life imprisonment and he said yes.

* * * I said, 'Let's go in court.'" He was nineteen years old, had been in jail for approximately six weeks and had not been mistreated in any way. Asked if the guilty pleas were voluntarily entered, he stated, "Voluntarily insofar as it was dictated by the information I had been given— * * * I think it would be more accurate to say I thought it was my only alternative, I had no other alternative. * * * the understanding I had been given was that I could take it to a jury if I wanted to, but it would be suicide if I did."

In answer to questions from the court, appellant stated that he was scared at the time he pleaded guilty because he had the charges against him; that he had the impression that Mr. Metz in his behalf "was trying to hustle the Judge to take the plea of guilty on life." The court asked Mr. Draper to tell what occurred and what appellant was charged with and, after Mr. Draper finished, asked appellant if he admitted Mr. Draper's statement, appellant answered, "Yes, sir." The Court: "You were scared to death you were going to get the death sentence, weren't you? Seven years have changed a lot of things." Answer: "It wasn't a matter of the death sentence, the possibility of winning."

Lt. Russell M. Taylor of the St. Louis Police Department was called by appellant. He had been a detective sergeant with the homicide squad in December 1959. He did not know what food or sleep appellant had during interrogation or how long he was questioned. He was present when a number of witnesses identified appellant as the robber and during the then standard procedure of having an accused repeat his confession to witnesses.

"Q * * * Was there any conversation if he would sign the confession they would not report this girl to the State Mental Institution? A Not to my knowledge."

Bernice Seibel, appellant's mother, recalled the conference prior to appellant's plea when they discussed "The sentence, and what would happen, and things like that,

just more or less a sentence—what would happen. * * * They said he would either get the death sentence or free, there would be no—nothing in between, but it was all death sentence and they were telling about different young boys, 19 year olds who had gotten the death sentence. * * * He was to be examined by a psychiatrist and they were supposed to get another day, * * * Mr. Metz * * * said, 'Go on home, because there is nothing going to happen today * * *.'" Mrs. Seibel was with her son, Mr. Metz, and Mr. Draper, "quite awhile." She never encouraged her son to go to trial in the case, and due to her fear of the death penalty, encouraged the guilty plea. Appellant had been paroled to Mrs. Seibel upon his release from the hospital in July or August of 1959. He entered the Army and after ten weeks went absent without leave and was AWOL when arrested on these charges.

Appellant also called Milton M. Metz, his lawyer at the time he was sentenced. He had been with the Public Defender Bureau starting in 1941. He was not specifically appointed to defend appellant but he did consult with him and appear for him. "That came about on the premise upon which we worked by visiting every person in the city jail that was charged with a felony offense, determining whether he had counsel or whether or not he could afford counsel. Then, as a matter of just procedure, we would represent him if he were without both, without money and without counsel." He conferred with appellant two or three times and Clarence Godfrey of his office also saw him. He heard appellant's testimony and stated, "We discussed the matter at length with George Draper who was then Assistant Circuit Attorney, discussed all the features of it we knew at that time, and that was it." Mr. Metz recommended that appellant plead guilty and take the life sentence on all four counts, "because I had—if I may embellish that answer by telling you this, if a man gets hit with an 80 or 90 year robbery sentence, it's much worse than a life sentence. That is why, of course, that we have oc-

casionally recommended or suggested that it be a life sentence plea, because they can come out in 16 or 17 years, not on 88 or 100 year sentence, though." Upon cross-examination he was asked if he had any indication that appellant was coerced into pleading guilty. "I certainly didn't, no. If I had thought that, I would not have been a party to the plea, certainly." The conference prior to pleading lasted "an hour or an hour and a half." Appellant at no time objected to his representation by Mr. Metz or the other lawyers of the Public Defender Bureau.

Prior to entry of the pleas, Mr. Metz told appellant and his mother the range of penalty in the cases. They understood "completely, and this fine young man, I liked the young fellow, his mother stood before the bar that morning, when this young man was sentenced. * * * I made a point of this * * * because of the youth of this man I wanted his mother here, and she was there. * * * I take it that he must be a very fine and intelligent young man really." He did not appear sick at the time of his plea.

Appellant closed his case upon offering "all notes, memoranda, records, statements, police reports and confessions made by Joseph John Maloney during the months of December, '59 and January of '60 to the St. Louis Police," the hospital report, and the court files in the four charges against him. These items establish the following chronology and proceedings:

December 9, 1959—Robbery by means of knife of Joseph Senn, employee, New St. Nicholas Hotel.

December 11, 1959—Robbery by means of knife of Theodore Shaffer, employee, Grand Central Hotel.

December 12, 1959—Robbery by means of knife of August B. Gordes, employee, New St. Nicholas Hotel.

December 12, 1959—Murder by means of knife of Joseph Thiemann in course of robbing Thiemann's place of business.

December 14, 1959—Coroner's inquest over body of Joseph Thiemann, victim of felony-murder December 12, 1959.

December 16, 1959—Joseph John Maloney arrested for investigation and on suspicion of murder, robbery, and AWOL from United States Army.

December 18, 1959—Charges of murder, first degree, of Joseph Thiemann; armed robbery of August B. Gordes; armed robbery of Theodore Shaffer; and armed robbery of Joseph Senn, filed in St. Louis Court of Criminal Correction on official oaths and informations of Curtis C. Crawford, Assistant Circuit Attorney.

December 18, 1959—Warrants for arrest of Joseph John Maloney issued by James P. Lavin, Clerk, St. Louis Court of Criminal Correction, on the foregoing complaints made by Curtis C. Crawford, Assistant Circuit Attorney.

December 18, 1959—Commitments issued by the Clerk of the St. Louis Court of Criminal Correction on the foregoing charges of murder and armed robbery, each reciting that Joseph John Maloney had been brought before that court as charged, that his cases were set for December 31, 1959, and that he was to remain in custody of the sheriff in jail to answer the charges or until released by due process of law.

December 31, 1959—Charles M. Deeba, Assistant Circuit Attorney, files request for continuance to January 8, 1960, on each of the foregoing charges "for the reason that the charge * * * is pending before the St. Louis Circuit Court Grand Jury."

January 12, 1960—Grand jury indictments filed charging Joseph John Maloney with: Murder, First Degree, of Joseph Thiemann, Cause No. 491; Armed Robbery of Joseph Senn, Cause No. 501; Armed Robbery of Theodore Shaffer, Cause No. 511; Armed Robbery of August B. Gordes, Cause No. 521.

January 12, 1960—Warrants for arrest and commitment of Joseph John Maloney on each of the foregoing charges issued by James F. Nangle, Judge of the Circuit Court of the City of St. Louis.

January 18, 1960—Curtis C. Crawford, Assistant Circuit Attorney, files Memorandum of Nolle Prosequi on each of the informations pending in the Court of Criminal Correction "for the reason that the St. Louis Circuit Court Grand Jury has returned an indictment into the Circuit Court of the City of St. Louis" charging Joseph John Maloney with the four charges pending in the Court of Criminal Correction.

January 20, 1960—Motion for Appointment of a Psychiatrist filed by Milton Metz, Joseph Noskay and Clarence Godfrey, "counsel for defendant."

February 1, 1960—Joseph Noskay, counsel for defendant, files memorandum withdrawing foregoing request "by reason of a letter from the Doctors of the State Hospital at Fulton which states that the defendant is not psychotic and knows the difference between right and wrong."

February 2, 1960—Letter of January 29, 1960, from H. G. Freund, M.D., Clinical Director, State Hospital No. 1, Fulton, Missouri, filed. In addition to those matters noted by Mr. Noskay, the letter recites that Joseph John Maloney has an I.Q. of 117 which places him in the bright-normal intelligence range in the upper fourth of the population.

February 2, 1960—Joseph John Maloney appears in open court with Milton Metz, Public Defender, withdraws plea of not guilty to each indictment, enters plea of guilty to each indictment, receives allocution, and is sentenced to life imprisonment on each indictment, the sentences all to run concurrently with the sentence on the indictment for murder, first degree.

Under this evidence, all offered by appellant, and on each of the grounds for relief, being all the grounds for relief known to him, the court made these findings:

"A. Defendant coerced into pleading guilty. This is the only contested issue.

"B. Defendant denied benefit of counsel. This is not borne out by the record.

"C. Arrested and held 27 days without a warrant, in violation of the laws of the State of Missouri. Not borne out by the record.

"D. Never taken before a committing magistrate. Not borne out by the record.

"E. Never offered and given a preliminary hearing. Not provided by the law when indicted by the Grand Jury.

"F. Indictment secured by use of evidence gained in violation of the law. No evidence produced to substantiate this charge.

"G. Sentencing Court without jurisdiction to impose sentence. Not borne out by the record.

"H. Defendant not permitted to be present at the Coroner's inquest. Defendant not apprehended, but at large on the date of the inquest.

"I. Defendant not taken before the Grand Jury. Not provided by law."

The court also found from the evidence that Milton Metz, Joseph Noskay and Clarence E. Godfrey of the Public Defender's office "undertook" to represent appellant in the latter part of December, 1959, or the first part of January, 1960, and that "defendant and his attorneys had adequate time to discuss and confer with each other and did so, and there was intelligent and conscious intent on the part of the defendant to plead guilty to murder in the first degree while committing another felony, robbery in the 1st degree with a dangerous and deadly weapon, and three additional charges of robbery in the first degree with a dangerous and deadly weapon; that the defendant did not lack mental capacity to

understand the proceedings against him; that the plea of guilty on all these charges was voluntarily entered with full knowledge of the consequences; that defendant was adequately represented and fully informed at the time of the pleas; that defendant was neither coerced by counsel nor misled into pleading guilty; that the only coercion or duress to which defendant was subjected was his own mother; and (in) the necessity of making a choice between standing trial or pleading guilty * * * defendant chose the latter voluntarily."

The court concluded as a matter of law that there were no grounds or causes for setting aside the pleas of guilty under Criminal Rules 27.26 or 27.25, V.A.M.R., that the sentences were not illegal, and there were no denials of appellant's constitutional rights.

■ Appellant contends that he was "coerced into pleading guilty," ground a of his motion, because, although he expressed desire for a jury trial, "he was pressured into pleading guilty by his court-appointed attorney and the Assistant Circuit Attorney." His theory is that the evidence shows that he did not have "opportunity reasonably to consult with counsel and to prepare a defense," State v. McDonald, Mo., 343 S.W.2d 68, 71 [3]; he recognizes that in order to show entitlement to withdrawal of his guilty pleas in this case he must prove the alleged coercion which induced the pleas, State v. Parker, Mo., 413 S.W.2d 489, 494.

■ The foregoing evidence and chronology of events prior to entry of the guilty pleas demonstrate that there was a question of fact for the court to resolve, i. e., whether appellant was "coerced into pleading guilty" in the manner alleged. In resolving the issue against appellant, the court had conflicting evidence to consider and the resolution is supported by evidence showing that appellant had three lawyers and that he consulted with them. Neither he nor they *requested* additional time, and they arranged for concurrent life sentences

in cases where appellant could have been sentenced to death. He did not testify that the assistant circuit attorney interfered with his consultations or that he threatened him in any way, and that attorney was shown to be present on only the one occasion. His own attorney simply stated the possibilities and alternatives. Appellant's mother may have encouraged the guilty pleas, but that was not legal coercion. Appellant stated his plea was voluntarily entered because he felt he lacked satisfactory alternatives. Appellant testified at length and his testimony, as well as the psychiatric report, shows he was articulate, responsive, and possessed of intelligence and understanding. He heard the assistant circuit attorney tell the court the circumstances of the four crimes and he acknowledged to the court the accuracy of the statement. A record such as this does not sustain, as a matter of law, a movant's burden of proving "wherein and by what fraud, mistake, misapprehension, fear, persuasion, or false or ill-founded hopes held out to him he was misled or induced to plead guilty." State v. Parker, supra, 413 S.W.2d 1. c. 494 [6].

The absence of "coercion" in these circumstances is stated in State v. Carter, Mo., 399 S.W.2d 74, 78 [6]:

" 'It is true, of course, that a sentence rendered upon a truly coerced plea of guilty is subject to collateral attack * * *.' Watts v. United States, 107 U.S.App.D.C. 367, 278 F.2d 247. In such cases the plea is involuntary because it represents a 'choice' made by the defendant which was brought about by improper inducements or through ignorance on his part of his rights.

"It might be said that every plea of guilty is entered pursuant to a form of 'coercion,' depending upon the definition assigned to that word. In every case the defendant is entitled to plead not guilty and place upon the state the burden of proving (and convincing a jury) that he is guilty of the offense charged beyond a reasonable doubt. The defendant is faced with the choice (some might call it a dilemma) of entering

a plea of guilty and taking his chances with the court as to punishment or risking a trial of the cause before a jury. Yet when the defendant is capable of understanding the situation before him and does understand it, the judgment entered pursuant to such plea of guilty certainly is not subject to collateral attack. There was no coercion or duress in the sense of being wrongful.

"In State v. Freedman, Mo., 282 S.W.2d 576, the defendant contended that his plea of guilty was entered under duress and coercion because the prosecuting attorney advised him that if they went to trial he would be charged under the habitual criminal act. At that time, when a defendant was so charged, the jury determined whether a defendant had previously been convicted, and if so, the statute required the imposition of the 'longest term prescribed' for the offense for which he was on trial when the authorized punishment was imprisonment for 'a limited term of years.' Section 556.280 RSMo 1949 (now repealed). This court held: 'While the record clearly shows that appellant was confronted with the dilemma of either entering a plea of guilty or being tried upon the charge in question before a jury, the record wholly fails to show that such alleged duress was such as would nullify the judgment and sentence entered by the court upon the plea of guilty. The compulsion under which appellant acted was neither unlawful, nor exercised for an unlawful purpose. Appellant exercised his own volition and choice with a full knowledge of the facts in entering a plea of guilty and taking his chances with the court as to punishment, rather than risking a trial of the cause before a jury.' "

■ Under these authorities and upon this record it cannot be said as a matter of law that manifest injustice resulted to appellant because there was ample evidence upon which to find that appellant's pleas were voluntarily and understandingly made. State v. Roark, Mo., 428 S.W.2d 508, 512 [1].

Appellant amplifies his charge that he was denied benefit of counsel, ground b, by stating that Mr. Metz "never discussed the case with defendant, never came to see defendant, and all conferences which finally occurred with Mr. Metz on the day of sentencing took place in the presence of the Assistant Circuit Attorney * * *."

■ The evidence supports the court's finding that this charge is not borne out by the record. The record shows affirmatively that Mr. Godfrey advised with appellant respecting the psychiatric problem; that Mr. Metz counseled with appellant two or three times and appeared with appellant at sentencing; that opportunity existed for consultation outside the presence of the assistant circuit attorney; and, finally, there was no indication of a need or request for more time in which to consult or prepare. State v. McMillian, Mo., 383 S.W.2d 721, 722 [1].

■ Appellant's complaint, ground c, that he was held twenty-seven days without a warrant is, as found by the court, not borne out by the record. The detail of his contention is that he was held without warrant from his arrest December 16, 1959, until issuance of warrants pursuant to the indictments January 12, 1960. Reference to the previous chronology shows that warrants for the arrest of Joseph John Maloney on a charge of murder and three charges of armed robbery were issued December 18, 1959. This period from appellant's initial arrest until warrant was issued was longer than the 20-hour limitation on detention without warrant in Criminal Rule 21.14, V.A.M.R., but this does not invalidate the judgment of conviction in the circumstances of this case. State v. Keeble, Mo., 399 S.W.2d 118, 121–122 [13].

■ Similarly, the charge, ground d, that appellant was never taken before a committing magistrate is not borne out by the record. Appellant states that he was not in court until he entered not guilty pleas

January 15, 1960; however, the record chronology shows, and appellant's testimony acknowledges, that he was taken before the St. Louis Court of Criminal Correction, the committing magistrate in felony cases in the City of St. Louis, December 18, 1959, and on that date committed to the custody of the sheriff to answer to the four charges or until otherwise released.

Appellant's charge, ground e, that he was never given or offered a preliminary hearing is without merit here because he was ultimately indicted by a grand jury. It was those indictments to which he entered his guilty pleas, and there is no requirement of preliminary hearing on grand jury indictments. State v. Turner, Mo., 353 S.W.2d 602, 604 [4]. The chronology shows that preliminary hearing on the charges filed on oath and information was set for December 31, 1959, and continued further in order for the evidence on those charges to be placed before the grand jury. When the grand jury indictments were filed, the charges contained in the affidavits were dismissed by *nolle prosequi.*

Appellant argues also on this ground that Criminal Rules 23.06 et seq., V.A.M.R., prohibit continuance of a preliminary hearing for more than ten days at a time and not for the purpose of securing an indictment in lieu of the affidavit upon which a preliminary hearing would be accorded. This argument is without merit because even where a preliminary hearing is required, it is a procedural matter which is waived when a defendant enters a plea of guilty or proceeds to trial upon a not guilty plea without requesting a preliminary hearing. State v. Keeble, supra, 399 S.W. 2d 1. c. 120–121 [8].

On his charge, ground f, that the indictments were secured by use of evidence gained in violation of law, appellant asserts that his confessions were illegal and were used to obtain the indictments. As found by the court, there is no evidence tending to show that the appellant's confessions were ever before the grand jury and the police files introduced by appellant show availability of evidence and testimony procured by investigation which would have supported the grand jury's action.

Appellant charges further, ground i, that these indictments were secured through denial of due process in that he was not taken before the grand jury. He cites no authority to support the position and research has not located any authority requiring that an accused about to be indicted be taken before the grand jury.

Appellant's charge, ground g, that the sentencing court was without jurisdiction is bottomed on an argument that the record shows no continuance from his trial date, February 1, 1960, to February 2, 1960, the date his pleas were entered. This again is a procedural matter not going to the issue of guilt or innocence and was waived by entry of the guilty pleas. State v. Gunther, Mo., 415 S.W.2d 733, 736 [2]. He would support this contention also by arguing that the court violated Criminal Rule 27.07(b), V.A.M.R., by not referring appellant to a probation officer for presentence investigation. That rule simply requires that where a probation officer is available to a court, that officer shall make a presentence investigation unless otherwise directed by the court, clearly authority for the court to make use of presentence investigation as discretion indicates.

Appellant's charge, ground h, that he was deprived of some right by not being permitted at the coroner's inquest is without merit because there is no provision requiring his attendance. He was not prevented from attendance by police or other authorities because he was not in custody on the date of the inquest.

Appellant charges also that the court erred in entering a *nunc pro tunc* order showing the appointment of Milton Metz as his attorney as of the time the

guilty pleas were entered. It is not necessary to discuss this charge because it has already been demonstrated that appellant had the benefit of counsel, not only Mr. Metz but Joseph Noskay and Clarence Godfrey as well. Under those circumstances appellant was not prejudiced by the *nunc pro tunc* order and the record shows it to have been entered pursuant to and reflective of memoranda available to the court which had been made at the time the pleas and judgments were entered.

The findings, conclusions, and judgment of the trial court are thus not clearly erroneous under Criminal Rule 27.26(j), V.A.M.R.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.